1
2
3
4
5
6            **UNITED STATES DISTRICT COURT**
7            **EASTERN DISTRICT OF CALIFORNIA**
8

**KAREN MARTINEZ,**                          1:05-CV-00931 OWW DLB

            **Plaintiff,**

   **v.**                                     **MEMORANDUM DECISION AND ORDER
                                              GRANTING DEFENDANT'S MOTION
                                              FOR SUMMARY JUDGMENT**
**PACIFIC GAS & ELECTRIC COMPANY
LONG TERM DISABILITY PLAN,**

            **Defendants.**

## 1.   INTRODUCTION

Plaintiff Karen Martinez ("Martinez") filed a complaint to
recover benefits from a Pacific Gas & Electric ("PG&E") Long Term
Disability ("LTD") employee benefit plan.  (Doc. 1, Complaint,
Filed July 21, 2005.)  Before the court is Defendant PG&E's
motion for summary judgment.  (Doc. 20, Mot. for Summary
Judgment, Filed September 1, 2006)  Martinez opposes the motion.
(Doc. 22, Opposition, Filed September 18, 2006)

## 2.   PROCEDURAL BACKGROUND

Martinez filed her complaint on July 21, 2005.  (Doc. 1,
Complaint.)  PG&E filed its motion for summary judgment on
September 1, 2006.  (Doc. 20, Mot. for Summary Judgment.)  On
September 18, 2006 Martinez filed her opposition.  (Doc. 22,

**1**

Opposition.)   On September 25, 2006, PG&E filed its reply.  (Doc. 25, Reply.)

### 3.   <u>FACTUAL BACKGROUND</u>

**A.   The Plan Terms**[1]

**I.   The Employee Benefit Administrative Committee as Administrator of the Plan**

According to the language of the PG&E's LTD Plan, the Employee Benefit Administrative Committee ("EBAC") is the Administrator of the Plan and responsible for the overall administration of the plan.  (Doc. 20-9, Jasper Decl., Exh. A at ¶ 24(b).)   According to the terms of the plan:

> The Administrator has the sole power and duty to establish, and from time to time revise, such rules and regulations as may be necessary to administer the Plan in a non-discriminatory manner for the exclusive benefit of Participants and all other persons entitled to benefits under the Plan.
> The Administrator shall also maintain such records and make such rules, computations, interpretations, and decisions as may be necessary or desirable for the proper administration of the Plan.  The Administrator shall maintain for inspection by Participants copies of the Plan, the group insurance contract, investment policy, each agreement with an investment manager, the latest annual report, plan description and summary description and any amendments or changes in any of these documents.  On written request, Participants may obtain from the Administrator a copy of any of these documents at a cost established by the Administrator from time to time.
> The Employee Benefit Administrative Committee shall have the authority to allocate among its members or to delegate to any other person any fiduciary responsibility with respect to the Plan.  The administrator may appoint and delegate to one or more individuals the power and duty to handle the day-to-day administration of the Plan.  Such individuals need not be members of the committee and shall serve at the pleasure of the committee.

(*Id.*)

---

[1] Doc. 20-9, Jasper Decl., Exh. A at ¶ 14(a).

### ii.  The Plan's Definition of Disability

The Plan's definition of disability is as follows:

The determination of disability will be made by the Administrator.  In general, a Participant shall be considered disabled if, by any reason of injury or illness, said Participant is off work and : (1)is unable to perform the duties of the Participant's classification, and (2) The employer is unable to place the participant in a position commensurate with the Participant's reduced work capabilities.  (Doc. 20-9, Jasper Decl., Exh. A at ¶ 14(a).)

According to Martinez, there does not appear to be any dispute that she meets these requirements.  Instead, Martinez argues that the dispute is whether her benefits are limited to two years due to the Plan's "mental/nervous limitation":

If the primary cause of a participant's disability is a Mental or Nervous Disorder except schizophrenia, dementia, organic brain syndromes, delirium, amnesia syndromes or organic delusional or hallucinogenic syndromes, and the Participant is not receiving Social Security disability benefits, Long-Term Disability benefits unless the Participant is hospitalized or institutionalized (institutionalized shall mean admission on a 24-hour basis to a facility under medical supervision and specializing in the treatment of alcoholism, drug addiction, chemical dependency or Mental or Nervous Disorder illness).  So long as Participant is hospitalized or institutionalized, benefits shall continue for the duration of the Participant's stay.  (*Id.,* ¶ 19(c))

//

**3**

**B.    Undisputed Facts**

**I.    PG&E's LTD Plan**

PG&E's LTD plan is covered by the provisions of the Employee
Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a).
(DSUF, No. 1)  The plan is self-funded and is the product of
collective bargaining negotiations between PG&E and the
International Brotherhood of Electoral Workers ("IBEW"), Local
1245.  (*Id.*)  The plan document provides that determination of
disability will be made by the Plan Administrator.  (DSUF, No. 2)

The Employee Benefits Administrative Committee ("EBAC") also
decides all appeals regarding benefits decisions.  (DSUF, No. 4)
The EBAC has delegated its operational authority through a
contract with Fortis Benefits, but retains its other authority,
including the authority to decide appeals under the Plan.  (DSUF,
No. 5)

In 1999 PG&E and the union representing employees including
those in Plaintiff's classification, negotiated amendments to the
LTD plan.  (DSUF, No. 6)  The amendments, which applied to all
employees whose onset of disability occurred after January 1,
2000 included a provision that LTD benefits would be limited to
two years if the primary cause of the employee's disability is a
mental or nervous disorder, except for schizophrenia, dementia,
amnesia syndromes or organic delusional or hallucinogenic
syndromes; and the employee is not receiving social security
benefits or is not hospitalized at the time the benefits expire.
(DSUF, No. 7)

**ii.    Martinez's LTD Claim**

Martinez is a 50-year-old woman who worked as a clerk in

**4**

1    PG&E's vegetation management department.  (DSUF, No. 8; Doc. 22,

2    Pl.'s Opposition.)   The position was covered by the terms of a

3    collective bargaining agreement between PG&E and the IBEW, Local

4    1245.  (DSUF, No. 9)  She was first hired in July of 1984, and

5    transferred to her final position in November of 2002.  (Doc. 22,

6    Pl.'s Opposition.)

7         Although Plaintiff has a history of Bi-polar II disease, she

8    was able to work with her condition until May 15, 2002.  (*Id.*)

9    On that day, she was hospitalized for two days due to depressive

10   symptoms of her disease.  (*Id.*)  Upon her release, she was unable

11   to return to work and has not returned since.  (*Id.*)

12        In November 2002 Ms. Martinez applied for LTD benefits.

13   (DSUF, No. 10)  PG&E's LTD Plan administrator granted plaintiff's

14   application for benefits based on her doctor's diagnosis of bi-

15   polar II depression.  (DSUF, No. 11)  Bi-polar depression is not

16   one of the mental disorders exempted from the two year limit

17   under defendant Plan.  (*Id.*)

18        The letter informing plaintiff of the approval of her

19   benefit claim explicitly stated that the maximum duration of the

20   benefits would be two years, ending on November 14, 2004, unless

21   she was hospitalized or receiving Social Security Disability

22   benefits.  (DSUF, No. 12)

23        Plaintiff's treating doctor sent the Plan Administrator

24   yearly medical reports.  (DSUF, No. 14)  Each of these reports

25   repeated the original diagnosis of depression (bi-polar II).

26   (*Id.*)  Neither report lists any physical ailments, other than the

27   assertion that Plaintiff's disorder results from a chemical

28   imbalance.  (*Id.*)

**5**

1    On May 1, 2003 and again on June 27, 2003, the Social

2  Security Administration denied Plaintiff's applications for

3  benefits, finding that she was capable of working, and that her

4  claimed limitations were not fully supported by the evidence in

5  the file.  (DSUF, No. 15)  The Plan administrator terminated her

6  benefits on November 2004.  (DSUF, No. 16)

7    Plaintiff appealed denial of LTD benefits to the EBAC.

8  (DSUF, No. 17)  In her letter of appeal, Plaintiff argued that

9  the Plan Administrator incorrectly characterized her bi-polar II

10 disorder as a mental or nervous disorder, limited to two years of

11 benefits.  (DSUF, No. 18)  Rather, she claims that it should be

12 considered a physical disorder because it was based on a chemical

13 imbalance.  (*Id.*)  She referred to "significant medical

14 information" she had located to support her contention.[2]  (*Id.*)

15   In addition to reviewing Plaintiff's medical records, the

16 EBAC consulted with a retained psychologist who issued a report

17 to Fortis.[3]  (DSUF, No. 19)  Based on its review of the record

18

19   [2] In her appeal letter dated December 24, 2004 Plaintiff
20 states that her bi polar II disorder is a chemical imbalance that
   "exists in the brain."  She further writes that "there is
21 significant medical information that [she has] located" which
   supports that her disease is a physical condition.  (Doc. 20-4,
22 Fries Decl., Ex. J, Filed September 1, 2006.)  Plaintiff however
   does not provide this information in the record.

23

24   [3] Specifically, the report noted that Plaintiff's has little
   information regarding Ms. Martinez's treatment or symptoms.
25 (Doc. 20-4, Fries Decl. Ex, K Fortis Behavioral Assessment dated
   January 15, 2005, Filed September 1, 2006.)  According to the
26 report, none of the information from any of the providers has
   provided a definitive type of Bi polar Disorder diagnosis.  (*Id.*)
27 Ms. Martinez stated that she had a Bi-polar II Disorder in her
   appeal letter dated 12/24/04.  (*Id.*)  According to DSM IV-TR a
28 Bi-polar II Disorder is defined as a clinical course of recurrent

**6**

and the psychologist's report, the EBAC denied Plaintiff's appeal and formally communicated its decision and the reasons for it to Plaintiff on March 10, 2005.[4]  (DSUF, No. 22)  The denial letter specifically referenced the Plan section limiting mental/nervous disorder to two years.  (*Id.*)

Schizophrenia, dementia, amnesia, delusional disorder, hallucinogenic syndromes, delirium and bi-polar II disorder are included in Diagnostic and Statistical Manual of Mental Disorders DSM-IV-TR, 4th ed., rev. Washington D.C. American Psychiatric Association, 2000 (DSM-IV).  (DSUF, No. 23)

**C.   Disputed Facts**

**I.   PG&E's LTD Plan**

The Plan designates the EBAC as the Administrator and further provides that the Administrator has the sole power to establish and revise Plan rules and regulations and make computations and interpretations as may be necessary or desirable for the proper administration of the Plan.  (DSUF, No. 3)

Plaintiff disputes this statement by arguing that while the plan does state that the EBAC has the sole power to establish and revise the plan, Plaintiff claims it does not vest sole power in

Major Depressive Disorder accompanied by at least one episode of hypomania.  (*Id.*)

[4] The report also noted that Plaintiff has written cogent letters regarding her claim on several occasions.  (Doc. 20-4, Fries Decl. Ex, K Fortis Behavioral Assessment dated January 15, 2005, Filed September 1, 2006.)  The report states that clearly, Plaintiff is not experiencing any cognitive difficulties regarding her written expressive language or abstract thought.  (*Id.*)  The preservation of such abilities in light of true organic mood disorder, according to the report, would be rather remarkable and unusual.  (*Id.*)

**7**

the EBAC to make computations and interpretations.  (PSUF, No. 3.)

**ii.  Plaintiff's LTD Claim**

In December 2002, plaintiff's treating doctor filled out a functional capacity assessment form in which he stated that plaintiff was physically fine, but suffered from "an inherited psychiatric illness." (DSUF, No. 13)

Plaintiff disputes this statement and argues that Dr. Norwood's statement was, "She physically is fine - body wise - She has an inherited psychiatric illness."  (PSUF, No. 13)

Further, Defendants argue that Plaintiff did not provide any of the "significant medical information" she uses to support her claim that her Bi-polar II disorder should be considered a physical, rather than mental, disorder.  (DSUF, No. 18) Plaintiff argues that the EBAC was in possession of plaintiff's physicians' reports, which constituted significant medical information in support of her claim.  (PSUF, No. 18)

According to Defendant, the psychologist's report stated, inter alia, that the Plan Administrator granted plaintiff's application for benefits based on a diagnosis of bi-polar II disorder; that bi-polar II depression is definitely a mental disorder, specifically included in DSM-IV; and is less serious and more easily controlled than some other types of mental disorders.  (PSUF, No. 20)  Further, all of the medical reports submitted to the LTD Administrator diagnosed plaintiff with bi-polar II disorder; none mentioned any other medical condition. (*Id.*)  Plaintiff disputes this fact to the extent that the statement attempts to paraphrase Dr. Jones' report.  (PSUF, No.

**8**

20.)  Plaintiff argues that Dr. Sievert's letter dated October 30, 2004 expressly diagnosed Plaintiff with organic mood disorder as well.[5]  (*Id.; see also,* Fries Decl., Ex. M.)

Although it was not a basis for plaintiff's appeal, the psychologist addressed the purported new diagnosis of organic mood disorder and discounted it, because in his opinion, such a disorder would result in significant loss of cognitive abilities. (DSUF, No. 21.)  Plaintiff disputes that this conclusion is correct.  (PSUF, No. 21.)

### 4.  <u>STANDARD OF REVIEW</u>

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  Fed. R. Civ. P. 56(c); *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998). Therefore, to defeat a motion for summary judgment, the non-moving party must show (1) that a genuine factual issue exists and (2) that this factual issue is material.  *Id.*  A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party.  *See Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986).  Facts are

---

[5] The letter is not clear as to whether Dr. Sievert's diagnosis that Plaintiff has organic mood disorder is based on a psychiatric assessment or based on Plaintiff's theory that her current mental state is related to gastric bypass surgery she underwent in 2000.

"material" if they "might affect the outcome of the suit under the governing law." *Campbell*, 138 F.3d at 782 (quoting *Anderson*, 477 U.S. at 248).

The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrell*, 477 U.S. 317, 322-23 (1986).  The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment. *See United States ex rel.  Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1996).  Nevertheless, the evidence must be viewed in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.  A court's role on summary judgment is not to weigh evidence or resolve issues; rather, it is to determine whether there is a genuine issue for

1  trial.  *See Abdul-Jabbar v. G.M. Corp.*, 85 F.3d 407, 410 (9th
2  Cir. 1996).

3  ## 5. __DISCUSSION__

4  **A.   Request for Judicial Notice**

5  Federal Rule of Evidence 201(b) permits courts to judicially
6  notice facts not subject to reasonable dispute because they are
7  either (1) generally known or (2) "capable of accurate and ready
8  determination by resort to sources whose accuracy cannot be
9  reasonably questioned."

10  Defendants request judicial notice of the following fact:
11  Schizophrenia, dementia, amnesia, delusional disorder,
12  hallucinogenic syndromes, delirium, and bi-polar disorder are
13  included in *Diagnostic and Statistical Manual of Mental Disorders*
14  *DSM-IV-TR, 4th ed., rev.* Washington, D.C., American Psychiatric
15  Association, 2000 (DSM-IV).

16  This fact is not in dispute.  Further, in *United States v.*
17  *Cantu*, 12 F.3d 1506, 1509 n.1 (9th Cir. 1993) the Ninth Circuit
18  took judicial notice of the content of the DSM-IV manual.

19  The request for judicial notice of the inclusion of bi-polar
20  disorder in DSM-IV is **GRANTED.**

21  **B    The Administrator's Determination is Reviewed De Novo**

22  To assess the applicable standard of review, the starting
23  point is the wording of the plan.  *Abatie, v. Alta Health & Life*
24  *Ins. Co.*, 458 F.3d 955, 962-963 (9th Cir. 2006).  When a plan
25  does not confer discretion on the administrator "to determine the
26  eligibility for benefits or to construe the terms of the plan," a
27  court must review the denial of benefits de novo "regardless of
28  whether the administrator or the fiduciary is operating under a

1  possible or actual conflict of interest." *Id.* at 963.  If de

2  novo review applies, no further preliminary analytical steps are

3  required.  *Id.*  The court simply proceeds to evaluate whether the

4  plan administrator correctly or incorrectly denied benefits.  *Id.*

5  But if a plan does confer discretionary authority as a matter of

6  contractual agreement, then the standard of review shifts to

7  abuse of discretion.  *Id.*  For a plan to alter the standard of

8  review from the default of de novo to the more deferential abuse

9  of discretion, the plan must unambiguously provide discretion to

10  the administrator.  *Id.*  If a plan administrator wishes to claim

11  the benefit of discretionary review, it is not difficult to draft

12  plan language to grant the appropriate discretion.  *Sandy v.*

13  *Reliance Standard Life Ins. Co.,* 222 F.3d 1202, 1206 (9th Cir.

14  2000).  The essential first step of the analysis is to examine

15  whether the terms of the ERISA plan unambiguously grant

16  discretion to the administrator.  *Id.*  Accordingly we first turn

17  to the text of the plan.  *Id.*

18      In *Abatie*, the language of the plan stated: "The

19  responsibility for full and final determinations of eligibility

20  for benefits; interpretation of terms; determination of claims;

21  and appeal of claims denied in whole or in part under the HFLAC

22  Group policy rests exclusively with HFLAC.  *Abatie,* 458 F.3d at

23  963*.*  The court in *Abatie* found this provision to be sufficient

24  to confer discretion on Alta, the plan administrator, and

25  successor in interest to Home Life, even though the word

26  "discretion" does not appear.  *Id.*  The court reasoned that

27  "there are no 'magic' words that conjure up discretion on the

28  part of the plan administrator."  *Id.*  A plan grants discretion

**12**

if the administrator has the "power to construe disputed or doubtful terms" in the plan. *Id.* Lastly, *Abatie* held that, unlike the language of the plan in *Ingram v. Martin Marrietta Long Term Disability Income Plan*, 244 F.3d 1109, 1112-1113 (9th Cir. 2001), the language of the *Abatie* plan bestowed on the administrator the responsibility to interpret the terms of the plan and to determine eligibility for benefits. *Id.* at 965.

The language of the PG&E LTD plan in this case cannot be said to be an unambiguous grant of discretionary authority to the EBAC. While Plaintiff argues that PG&E's plan does not use the words "full and final," "discretion," or anything similar that would connote discretionary authority there are no "magic" words that conjure up discretion on the part of the plan administrator. *Abatie*, 458 F.3d at 963. Further, the word "discretion" need not appear for discretion to be explicit. *Id.*

However, unlike other plan provisions that have conferred discretion,[6] the language of the PG&E plan is unclear as to

---

[6] For example, the plan in *Bogue v. Ampex Corp.*, 976 F.2d 1319, 1324 (9th Cir. 1992), stated that "the determination... will be made by Allied-signal upon consideration of whether the new position... has responsibilities similar to those of your current position"; the plan in *Eley v. Boeing Co.*, 945 F.2d 276, 278 n.2 (9th Cir. 1991), provided that "the company shall determine the eligibility of a person for benefits under the plan, pursuant to the terms and conditions specified"; the plan in *Jones v. Laborers Health & Welfare Trust Fund*, 906 F.2d 480, 481 (9th Cir. 1990), specified that the "Board of Trustees shall have power to construe the provisions of this Trust Agreement and the Plan, and any such construction adopted by the Board in good faith shall be binding"; the plan in *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1107 (9th Cir. 2000) which gave the administrator "sole discretion to interpret the terms of the Plan" and whose interpretations "shall be conclusive and binding" conferred discretion sufficient to overcome the presumption in favor of de

whether it confers authority on EBAC to determine eligibility, to construe the terms of the Plan, or to make final and binding determinations.  The PG&E plan language states that the EBAC, as the administrator of the plan:

> (1)   is responsible for the overall Administration of the Plan
>
> (2)   has the sole power and duty to establish, and from time to time, revise such rules and regulations as may be necessary to administer the Plan
>
> (3)   shall maintain such records and make such rules, computations, interpretations, and decisions as may be necessary or desirable for the proper administration of the Plan.

(Doc. 20-9, Jasper Decl., Exh. A at ¶ 24(b).)  Unlike the language in *Abatie*, it cannot be said that PG&E's plan language is unambiguous in granting discretionary authority to the EBAC. Discretion in this case cannot be inferred simply from the EBAC being responsible for the administration of the plan and for establishing and revising the rules of the plan.  Further, while the language which states that the EBAC shall "maintain such records and make such rules, computations, interpretations, and decisions as may be necessary or desirable for the proper administration of the Plan," does connote discretionary decision making, it does not unambiguously grant the EBAC power to determine eligibility, to construe the terms of the Plan, or to

---

novo review; and in the language in *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 943 & n.1 (9th Cir. 1999) which acknowledged "full and exclusive authority to interpret the Group Policy" along with a provision that "any decision [made] in the exercise of our authority is conclusive and binding" clearly confers discretion to decide whether a claimant is disabled.  *see also, Sandy*, 222 F.3d at 1206.

make decisions that are final and binding. *see, Sandy*, 222 F.3d at 1206.  It does not say the EBAC shall solely and finally determine eligibility and the extent of benefits.  The language "necessary and desirable" is ambiguous as to the extent and conclusions of EBAC's discretion to make decisions as to benefits.  The EBAC's determination of Plaintiff's benefits will be reviewed de novo. *see, Id.* at 1207 (it should be clear: unless plan documents unambiguously say in sum or substance that the Plan Administrator or fiduciary has authority, power, or discretion to determine eligibility or to construe the terms of the Plan, the standard of review will be de novo.)

**C.   The Plan Definition of "Mental or Nervous Disorder" is Unambiguous**

The "mental/nervous limitation" of the LTD plan provides:

"If the primary cause of a participant's disability is a Mental or Nervous Disorder except schizophrenia, dementia, organic brain syndromes, delirium, amnesia syndromes or organic delusional or hallucinogenic syndromes, and the Participant is not receiving Social Security disability benefits, Long-Term Disability benefits will end immediately after two years from the date the participant became eligible to receive Long Term Disability benefits unless the Participant is hospitalized or institutionalized (institutionalized shall mean admission on a 24-hour basis to a facility under medical supervision and specializing in the treatment of alcoholism, drug addiction, chemical dependency or Mental or Nervous Disorder illness).  So

**15**

1    long as Participant is hospitalized or

2    institutionalized, benefits shall continue for the

3    duration of the Participant's stay."

4    It is undisputed that Plaintiff's treating doctor

5    characterized her disability as a psychiatric illness.  It also

6    undisputed that Plaintiff's bi-polar II diagnosis was not one of

7    the explicitly excepted mental disorders under the Plan, and that

8    Plaintiff was not hospitalized or accepted for Social Security

9    Benefits.

10    However, Plaintiff argues that the dispute in this case

11    hinges on whether Plaintiff's condition is a "Mental or Nervous

12    Disorder" as defined by the Plan.

13         **a.   Under the Policy Terms Plaintiff is Not Entitled
               to Benefits**

14

15    Plaintiff first argues that the Plan provision is fatally

16    ambiguous because it fails to adequately define mental illness.

      In support of her argument, Plaintiff first cites *Kunin v.*

17    *Benefit Trust Life Ins., Co.,* 910 F.2d 534 (9th Cir. 1990.)  In

18    Kunin, Plaintiff sought reimbursement from his group health

19    insurance policy for treatment of his child's autism.  *Kunin,* 910

20    F.2d at 535.  The court dealt with the issue of whether the term

21    "mental illness" encompasses autism.  *Id.*  The *Kunin* court agreed

22    that the Administrator acted unreasonably in determining that

23    autism was a "mental illness."  *Id.* at 539.  The record did not

24    indicate that the doctors with whom the medical director

25    consulted had any significant experience with or particular

26    expertise concerning autism.  *Id.* at 538.  The director made no

27    effort to discuss the matter with Kunin's physicians who later

28

**16**

testified that autism was not a mental illness. *Id.* Further, the textbook definition Dr. Zolot relied on states that although autism was previously thought to be "primarily psychiatric," it later came to be thought of as organically based." *Id.* The court reasoned that, on its face, this definition contains no conclusions about whether autism should be classified as a mental illness. *Id.* Ultimately the fact that autism was no longer considered "primarily psychiatric" suggests that autism is not a mental illness. *Id.*

Plaintiff also cites *Patterson v. Hughes Aircraft Co.,* 11 F.3d 948, 950 (9th Cir. 1993). In *Patterson*, Plaintiff filed a claim for disability benefits due to headaches. *Patterson,* 11 F.3d at 949. The Administrator found Plaintiff totally disabled and began paying benefits. *Id.* However, the benefits were terminated two years later on the ground that Plaintiff's disability "was mental rather than physical, and that he had exhausted the policy's two year limitation on benefits resulting from "mental, nervous or emotional disorders of any type." *Id.* Upon review, the court held that the term "mental disorder" was ambiguous because the language of the plan did "not define 'mental disorder,' or offer illustrations of conditions that are excluded or included." *Id.* at 950. The court reasoned that the term "mental illness" is ambiguous in two ways: (1) The plan did not specify whether a disability is to be classified as "mental" by looking to the cause of the disability or to its symptoms and (2) the Plan does not make clear whether a disability qualifies as a "mental disorder" when it results from a combination of physical and mental factors. *Id.* According to the court,

**17**

1  Plaintiff's disability may result solely from depression, or
2  solely from headaches, or a combination of the two.  *Id.*

3     Similarly in *Mongeluzo v. Baxter Travenol Long Term*
4  *Disability Plan,* 46 F.3d 938 (9th Cir. 1995) the language of the
5  mental health limitation stated in relevant part: "Payment will
6  not be made under this plan for any disability... for more than
7  24 months during your lifetime if the disability is caused by
8  mental illness or functional nervous disorder.  *Id.* at 941.
9  Relying on *Patterson*, the court in *Mongeluzo* reasoned that the
10 mental illness limitation as applied to plaintiff was ambiguous.
11 *Id.* at 942.  Plaintiff suffered from symptoms including fatigue,
12 ulcerative colitis, oral candidiasis, painful lymph nodes,
13 recurrent headaches, muscle weakness, joint pain, depression and
14 anxiety.  *Id.*  The court held that the policy did not address the
15 question of whether a disability with mixed physical and
16 emotional symptoms and an unclear etiology is considered a
17 "mental illness."  *Id.*  This is particularly problematic in cases
18 - such as plaintiffs's - where the vast majority of symptoms are
19 physical, but the patient becomes depressed or anxious over a
20 lack of adequate medical diagnosis and treatment.  *Id.*  In this
21 case, Martinez's claim is factually distinguishable from
22 *Mongeluzo* since she does not provide evidence that her disability
23 is a mix of physical and emotional symptoms.

24     Lastly, Plaintiff cites *Lang v. Long Term Disability Plan of*
25 *Sponsor Applied Remote Tech., Inc.,* 125 F.3d 794 (9th Cir. 1997.)
26 In *Lang*, Plaintiff's disability to work was triggered by stress
27 arising from her job.  *Id.* at 796.  The symptoms she described
28 were "uncontrollable crying," "throwing up before work," and

**18**

1  "inability to concentrate." *Id.* Plaintiff was diagnosed as

2  having depressive neurosis and was treated for insomnia and

3  frequent crying spells. *Id.* Under the insurance plan, mental

4  disorder was defined as "mental, emotional, behavioral, or

5  stress-related disorder." *Id.* The plan, however, was silent as

6  to whether the administrator should look to causes or symptoms

7  when determining whether the claimant had a "mental disorder" for

8  purposed of applying the limitation. *Id.* Further, while

9  Plaintiff was receiving benefits during the two year period, she

10 was diagnosed with a type of muscular or soft-tissue rheumatism

11 that affects principally muscles and their attachment to bones.

12 *Id.* The depression and anxiety associated with this rheumatism

13 are believed to be symptoms of the muscular disease. *Id.* In

14 reliance on *Kunin* and *Patterson,* this court also held that the

15 term "mental disorder" was ambiguous because it did not include

16 "mental" conditions resulting from "physical" disorders. *Id.* at

17 779.

18      This case, however, is factually distinguishable from the

19 cases cited by Plaintiff. Plaintiff does not contend that her

20 bi-polar II disorder is the result or symptom of a physical

21 disorder or condition, except as it relates to a "chemical

22 imbalance" which is medically unexplained. It is undisputed that

23 Plaintiff's treating doctor sent the Administrator yearly medical

24 reports which repeated the original diagnosis of bi-polar II

25 depression. Neither report listed any physical ailments, other

26 than the uncorroborated opinion that Plaintiff's disorder

27 resulted from a chemical imbalance. Further, Plaintiff's

28

**19**

treating doctor characterized her disability as a psychiatric illness.

Unlike the policy in *Patterson,* the policy in this case does define what mental disorders are included rather than only those that are not excluded from the terms of the LTD policy.[7] Bi polar II disorder is a known psychological disability. The fact that some psychological conditions were included in the policy's language and that bi-polar II disorder was not indicates an intent by the insurer to specifically exclude bi-polar II disorder from coverage.[8] While Plaintiff concedes that the Plan

---

[7] The policy states that "if the primary cause of a participant's disability is a mental or nervous disorder except schizophrenia, dementia, organic brain syndromes, delirium, amnesia syndromes or organic delusional or hallucinogenic syndromes...benefits will end immediately after two years..."

[8] This forecloses Plaintiff's argument that she is entitled to further benefits. Plaintiff cites the District of Columbia District Court case of *Fitts v. Unum Life Ins. Co. of Am.*, 2006 U.S. Dist. LEXIS 9235 (D.D.C. 2006). In *Fitts*, under the LTD insurance policy, any employee who develops a disability is eligible for a certain package of benefits until age sixty-five. *Id.* at *3. The policy contains an exception, however. *Id.* If the employee's disability is "due to a mental illness," the employee's benefits are discontinued after twenty-four months. *Id.* The policy in *Fitts* defines mental illness as a "mental, nervous or emotional disease or disorder of any type." *Id.* The court framed the final issue *Fitts* as whether Plaintiff had been properly diagnosed as someone suffering from bi polar disorder, and as such, an individual who should be excluded from the policy's mental illness exception. *Id.* at *25. The inquiry in this case, however, is different from *Fitts*. In this case, the policy language includes a list of mental illnesses that are covered under the plan beyond the two year exception. There is no question that certain mental illnesses, such as Bi-Polar II disorder, do not fall under the policy's mental illness exception. Because the insurance company expressly excluded Bi-polar II disorder from the policy coverage beyond two years, a *Fitts* inquiry as to whether Plaintiff was properly excluded from

does include specific exceptions, she argues that it does not explain why these conditions are excepted and that there is no identifiable link between any of them.  Plaintiff argues there is no reason to believe that bi polar illness should be equated with any of these conditions, as defendant suggests.  However, Plaintiff offers no law to support her argument that a lack of an explanation as to the excepted mental conditions in the policy makes the terms of the policy ambiguous.

It also undisputed that Plaintiff's bi-polar II diagnosis is not one of the explicitly excepted mental disorders from limited coverage under the Plan, and that Plaintiff was not hospitalized nor accepted for Social Security Benefits.

In addition to reviewing Plaintiff's medical records, the Administrator consulted with a retained psychologist who issued a report on Plaintiff's mental illness.  It is an undisputed judicially noticed fact that bi-polar II disorder is among the mental disorders listed in Diagnostic and Statistical Manual of Mental Disorders IV.  Unlike the disorder of autism in *Kunin*, there is no question, based on undisputed facts, that bi-polar II disorder is a mental, rather than physical, disorder.

---

the mental illness exception is not applicable in this case. Plaintiff also argues that the Ninth Circuit uses a "caused based" classification of what constitutes "mental illness." However, the cases discussed in *Fitts* and cited by Plaintiff are cases where the language of the policy as to the term "mental illness" is ambiguous.  That is not the case here where the language intentionally includes some mental illnesses while intentionally excluding others.

1    However, even if the terms of the PG&E Policy were

2   ambiguous, the doctrine of contra proferentem, which requires

3   ambiguities in insurance contracts be construed against the

4   drafter of the contract, does not apply in this case.  In *Winters*

5   *v. Costco Wholesale Corp.*, 49 F.3d 550 (9th Cir. 1995), the Ninth

6   Circuit held that "the rule of contra proferentem is not

7   applicable to self-funded ERISA plans that bestow explicit

8   discretionary authority upon an administrator to determine

9   eligibility for benefits or to construe the terms of the plan."

10  *Id.* at 539; *see also, Eley v. Boeing Company*, 945 F.2d 550, 280

11  (1990)(questioned on other grounds.)  In this case, it is

12  undisputed that the plan is self-funded and is the product of

13  collective bargaining negotiations between PG&E and the

14  International Brotherhood of Electrical Workers ("IBEW"), Local

15  1245.  (*Id.*)  If the plan contained any ambiguities in its

16  language, according to *Winters* and *Eley*, the ambiguities would

17  not be resolved against the Plan.

18       **ii.  The Evidence in the Record Supports a Finding that the**
              **EBAC's Determination Was Based Upon a Reasonable**
19            **Interpretation of the Plan's Terms.**

20       Here, it cannot be said that the Administrator's denial of

21  Plaintiff's claims was based on clearly erroneous findings of

22  fact.  It is undisputed that Plaintiff's treating doctor sent the

23  Plan Administrator yearly medical reports.  Each of these reports

24  repeated and confirmed the original diagnosis of depression (bi-

25  polar II), a mental illness.  Neither report lists any physical

26  ailments or causes, other than the opinion that Plaintiff's

27  disorder is related to a chemical imbalance.  Plaintiff was also

28  denied Social Security disability benefits based on her bi-polar

**22**

1  II disorder and the finding that her cognitive and overall

2  functioning were not as impaired that she could not perform work.

3      Plaintiff appealed denial of PG&E's LTD benefits to the

4  EBAC.  In her letter of appeal, Plaintiff argued that the Plan

5  Administrator incorrectly characterized her bi-polar II disorder

6  as a mental or nervous disorder, limited to two years of

7  benefits.  Rather, she claims that it should be considered a

8  physical disorder because it was based on a chemical imbalance.

9  She referred to "significant medical information" she had located

10 to support her contention.  However, she did not provide such

11 medical information in the record or to the EBAC.

12      In addition to reviewing Plaintiff's medical records, the

13 EBAC consulted with a retained psychologist who issued a report

14 to Fortis.  Based on its review of the record and the

15 psychologist's report, the EBAC denied Plaintiff's appeal and

16 formally communicated its decision and the reasons for it to

17 Plaintiff on March 10, 2005.  The denial letter specifically

18 referenced the Plan section limiting mental/nervous disorder to

19 two years.

20      It is also undisputed that Schizophrenia, dementia, amnesia,

21 delusional disorder, hallucinogenic syndromes, delirium and bi-

22 polar II disorder are included mental disorders in Diagnostic and

23 Statistical Manual of Mental Disorders DSM-IV-TR, 4th ed., rev.

24 Washington D.C. American Psychiatric Association, 2000 (DSM-IV).

25 (DSUF, No. 23)

26      Substantial evidence proves that the decision of the EBAC,

27 as the PG&E's LTD plan administrator, was based upon a good faith

28 reliance on and reasonable interpretation of the plan's terms,

the medical record, Plaintiff's psychiatric evaluations
submitted, and on an undisputed supplemental experts' medical
report.

Defendant's motion for summary judgment is **GRANTED.**

### 6.  CONCLUSION

Defendants's motion for summary judgment is **GRANTED.**
Defendant shall submit a form of judgment consistent with this
decision within five (5) days following service by the clerk of
this decision.

IT IS SO ORDERED.

**Dated:    November 15, 2006**              **/s/ Oliver W. Wanger**
dd0l0                                        UNITED STATES DISTRICT JUDGE